UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------

| | |
|---|---|
| MARTIN SCHIFFENBAUER,<br><br>                   Plaintiff,<br><br>        v.<br><br>MYOVANT SCIENCES LTD., TERRIE CURRAN, MARK GUINAN, ADELE M. GULFO, DAVE MAREK, SHIGEYUKI NISHINAKA, MYRTLE POTTER, AND NANCY VALENTE,<br><br>                   Defendants. | Case No. 22-cv-10467<br><br>**COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Martin Schiffenbauer ("Plaintiff"), by the undersigned attorneys, alleges as follows based (i) upon personal knowledge with respect to Plaintiff's own acts, and (ii) upon information and belief as to all other matters based on the investigation conducted by Plaintiff's attorneys, which included, among other things, a review of relevant U.S. Securities and Exchange Commission ("SEC") filings, and other publicly available information.

## NATURE OF THE ACTION

1.      This action is brought by Plaintiff against Myovant Sciences, Ltd. ("Myovant" or the "Company") and the members of the Company's Board ("Board") for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78n(a) and § 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9(a) ("Rule 14a-9"). Plaintiff's claims arise in connection with the solicitation of public stockholders of Myovant to vote in favor of a merger transaction

("Merger") pursuant to which Sumitovant Biopharma Ltd. ("Sumitovant") will acquire all of the outstanding shares of common stock of Myovant from Myovant public stockholders for $27.00 per share in cash ("Merger Consideration"), and Myovant will merge into an affiliate of Sumitovant.

2.       As of November 30, 2022, Sumitovant beneficially owned approximately 51.6% of the outstanding Myovant common shares. As such, the proposed Merger is a "going-private" transaction under the rules of the SEC.

3.       Sumitovant became the majority shareholder of Myovant on December 27, 2019 via a series of related transactions. Sumitovant is wholly owned by Sumitomo Pharma Co., Ltd. of Japan ("Sumitomo Pharma").

4.       On October 23, 2022, Myovant, Sumitovant and Sumitomo Pharma announced the Merger.

5.       On December 8, 2022, Defendants authorized the filing of a false and misleading preliminary proxy on Schedule 14A ("Proxy") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9, with the aim of soliciting Myovant stockholders to vote for the Merger ("Stockholder Vote") at a special meeting of Myovant stockholders to be held on a date yet to be determined. Under the terms of the agreement governing the Merger ("Merger Agreement"), a majority of the outstanding Myovant common shares held by Myovant's shareholders other than Sumitovant or its affiliates must vote to approve the Merger in order for the Merger to proceed.

6.       As detailed below, the Proxy contains material misrepresentations, and material omissions that render statements therein misleading. These material misrepresentations and omissions render the Proxy false and misleading in violation of the above-referenced Exchange

Act provisions and Rule 14a-9.

7.  The violations referenced above must be cured in advance of the Stockholder Vote to enable Myovant stockholders to cast informed votes with respect to the Merger. Therefore, Plaintiff seeks to enjoin the Defendant from taking any further steps to consummate the Merger and schedule the Stockholder Vote, until such violations are cured. Alternatively, if the Merger is consummated, Plaintiff reserves the right to recover damages suffered by Plaintiff and similarly-situated investors as a result of such violations.

## JURISDICTION AND VENUE

8.  This Court has subject matter jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

9.  This Court has personal jurisdiction over each of the Defendants because each defendant has sufficient minimum contacts with the United States so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. *See Moon Joo Yu v. Premiere Power LLC*, No. 14 CIV. 7588 KPF, 2015 WL 4629495, at *5 (S.D.N.Y. Aug. 4, 2015) (because Exchange Act provides for nationwide service of process, and Defendant resides within the United States, and conducts business within the United States, he should reasonably anticipate being haled into court in the United States, and Court's exercise of personal jurisdiction over Defendant with respect to Plaintiffs' securities fraud claim is proper); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 NRB, 2015 WL 6243526, at *23 (S.D.N.Y. Oct. 20, 2015) ("[w]hen the jurisdictional issue flows from a federal statutory grant that authorizes suit under federal-question jurisdiction and nationwide service of process . . . Second Circuit has consistently held that the minimum-contacts test in such circumstances looks

to contacts with the entire United States rather than with the forum state.").

10. Venue is proper under 28 U.S.C. § 1391(b) because Defendants transact business in this District. In particular, the Company's common stock trades under the ticker "MYOV" on the NYSE, which is headquartered in this District, and the false and misleading Proxy was filed with the SEC, which has a regional office in this District. *See Mariash v. Morrill*, 496 F.2d 1138, 1144 (2d Cir. 1974) (venue appropriate in the Southern District of New York where an act or transaction constituting the alleged violation occurred in the Southern District of New York); *United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (venue in tender offer fraud prosecution appropriate in District).

## PARTIES

11. Plaintiff is, and has been at all relevant times, a continuous stockholder of Myovant common stock.

12. Defendant Myovant is a Bermuda corporation with its principal executive offices located at 7th Floor, 50 Broadway, London, SW1H 0DB, United Kingdom.

13. Defendant Terrie Curran ("Curran") has served as a member of the Board at all relevant times.

14. Defendant Mark Guinan ("Guinan") has served as a member of the Board at all relevant times.

15. Defendant Adele M. Gulfo ("Gulfo") has served as a member of the Board at all relevant times. Defendant Gulfo also currently serves as Chief Commercial and Business Development Officer of Sumitovant.

16. Defendant Dave Marek ("Marek") presently serves as Chief Executive Officer ("CEO") of Myovant, and has served as a member of the Board at all relevant times.

17. Defendant Shigeyuki Nishinaka ("Nishinaka") has served as a member of the Board at all relevant times. Defendant Nishinaka also presently serves as a member of the board of directors of Sumitomo Pharma.

18. Defendant Myrtle Potter ("Potter") has served as a member of the Board at all relevant times. Defendant Potter also presently serves as CEO of Sumitovant.

19. Defendant Nancy Valente ("Valente") has served as a member of the Board at all relevant times.

20. Defendants identified in paragraphs 13 to 19 are collectively referred to herein as the "Individual Defendants," and together with Myovant, collectively, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**Myovant's Business**

21. Myovant is a biopharmaceutical company that has executed multiple successful Phase 3 clinical trials of drugs addressing hormone-sensitive conditions leading to multiple regulatory approvals in the United States and Europe for three drugs: ORGOVYX, MYFEMBREE, and RYEQO. ORGOVYX is by far the best-selling of these three drugs. For example, on July 27, 2022, Myovant reported the following results for Q1 2022: net product revenue from U.S. sales of ORGOVYX® of $36.0 million, net product revenue from U.S. sales of MYFEMBREE® of $4.0 million, and net product revenue of $1.1 million for RYEQO.

**Background to the Merger**

22. On April 4, 2022, Sumitovant and Sumitomo Pharma submitted a letter to the Board requesting access to information concerning Myovant's business to conduct due diligence in connection with a potential proposal to acquire the remaining common shares of Myovant that Sumitovant did not already own. The letter advised that any transaction following such proposal

5

would be subject to, *inter alia*, a non-waivable condition requiring the approval of public Myovant shareholders holding a majority of the Myovant common shares not owned by Sumitovant.

23. On April 28, 2022, the Board approved the formation of a special committee ("Special Committee") consisting of Defendants Guinan, Curran and Valente. The Special Committee was empowered to (i) review and evaluate any proposal from Sumitovant or its affiliates in order to make a recommendation to the Board regarding whether Myovant should seek to engage in a potential transaction with Sumitovant, (ii) if determined that Myovant should seek to engage in a potential transaction with Sumitovant, develop and negotiate the terms and make a recommendation to the full Board regarding whether Myovant should enter into such potential transaction, (iii) identify, review and evaluate available alternatives to a potential transaction with Sumitovant, including remaining a separate company, and (iv) recommend to the Board what further actions, if any, should be taken with respect to a potential transaction with Sumitovant or any alternative thereto.

24. The same day, the Special Committee approved the engagement of (i) Goldman Sachs & Co. LLC ("Goldman Sachs") as its financial advisor; (ii) Cooley LLP ("Cooley") as its U.S. counsel; and (iii) Conyers Dill and Pearman Limited ("Conyers") as its Bermuda counsel.

25. On June 28, 2022, the Special Committee determined to retain Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") as its counsel. The Proxy fails to disclose, however, whether the Special Committee retained Skadden because of a newly discovered potential conflict with respect to Cooley, which the Special Committee had previously retained on April 28, 2022, as its U.S. counsel.

26. Additionally, on June 28, 2022, Myovant's management and the Special Committee reviewed preliminary illustrative financial projections for Myovant that had been

prepared by management at the request of the Special Committee, based on preliminary five-year projections that had been presented by management to the Board earlier in the year as part of Myovant's regular long-range planning process.

27.    On August 22, 2022, Goldman Sachs reviewed with the Special Committee preliminary illustrative financial projections prepared by Myovant's management, and certain sensitivity analyses prepared by Goldman Sachs. The Special Committee instructed Goldman Sachs to use the latest preliminary illustrative financial projections prepared by Myovant's management in Goldman Sachs' analyses.

28.    On September 30, 2022, Sumitovant delivered a non-binding proposal to acquire all of the Myovant common shares not already owned by Sumitovant for $22.75 per share in cash.

29.    After additional negotiations over price and other terms of the Merger, Sumitovant advised the Board on October 22, 2022, that $27.00 per share in cash was Sumitovant's best and final offer. On October 23, 2022, the Special Committee accepted that offer.

30.    Later on October 23, 2022, Goldman Sachs presented its opinion ("Fairness Opinion") to the Special Committee that the Merger Consideration was fair from a financial point of view to Myovant stockholders. Following receipt of Goldman Sachs' Fairness Opinion, the Special Committee unanimously (i) determined, *inter alia*, that the terms of the Merger are fair to and in the best interests of Myovant and its shareholders; and (ii) recommended, *inter alia*, that the Board approve the Merger and recommend that Myovant stockholders vote in favor of the Merger. The members of the Board (other than those Board members nominated by Sumitovant and Sumitomo Pharma) subsequently met and adopted the Special Committee's recommendations.

31.    After signing the Merger Agreement and other relevant agreements on October 23, 2022, Myovant, Sumitovant and Sumitomo Pharma jointly announced the Merger.

**The Proxy Contains Material Misrepresentations and Omissions**

32. Defendants disseminated a false and misleading Proxy to Myovant stockholders that misrepresents or omits material information that is necessary for Myovant stockholders to cast fully informed votes with respect to the Merger.

*__Material Omissions Concerning any Potential Conflicts of Cooley__*

33. A proxy must disclose potential (not just actual) conflicts of interest of a target's advisors, including counsel. The relevant inquiry is not whether an actual conflict of interest existed, but rather whether full disclosure of potential conflicts of interest affecting advisors has been made to enable shareholders to cast fully informed votes.

34. Here, the Proxy discloses that, on April 28, 2022, the Special reviewed "disclosures ***regarding any potential conflicts of interest*** [its proposed financial and legal] advisors may have with respect to a potential transaction with Sumitovant." After reviewing such disclosures, the Special Committee retained Goldman Sachs as its financial advisor, Cooley as its U.S. counsel and Conyers as its Bermuda counsel.

35. The Proxy further discloses that on June 28, 2022, the Special Committee retained Skadden as its U.S. counsel. The Proxy does not explain, however, whether a newly discovered potential conflict of interest affecting Cooley motivated the Special Committee to substitute Skadden for Cooley as its U.S. counsel. If there were any potential conflicts of interest discovered with respect to Cooley, they must be disclosed since Cooley was the exclusive U.S. legal advisor to the Special Committee for two months until the retention of Skadden on June 28, 2022, and thereafter Cooley participated in another meeting of the Special Committee on July 26, 2022, at which Cooley advised the Special Committee concerning the impact a loss of patent exclusivity

would have on the preliminary financial projections prepared by Myovant's management, which Goldman Sachs used to prepare the Fairness Opinion.

*Material Omissions Concerning the Fairness Opinion*

36. The Fairness Opinion by Goldman Sachs included in the Proxy improperly failed to disclose certain material information concerning what the Proxy refers to as the "Premia Analyses" and "Illustrated Discounted Cash Flow Analysis," which were two of the three analyses used by Goldman Sachs to support its opinion that the Merger Consideration was fair to Myovant stockholders. Without this information, as described below, Myovant stockholders are unable to fully understand Goldman Sachs' Premia Analyses and Illustrated Discounted Cash Flow Analysis, and thus are unable to determine what weight to place on such Analyses, and the Fairness Opinion as a whole, in determining whether to vote for the Merger. This omitted information rendered the Fairness Opinion misleading, and if disclosed, would significantly alter the total mix of information.

**Premia Analyses**

37. With respect to Goldman Sachs' Premia Analyses, the Proxy states:

> ***Goldman Sachs reviewed and analyzed, using publicly available information, the acquisition premia in acquisition transactions announced during the time period from January 1, 2012 through October 21, 2022, involving a public company in the biopharmaceutical industry as the target in a minority squeeze out transaction where the disclosed enterprise value for the transaction was over $500 million***. For the entire period, using publicly available information, Goldman Sachs calculated the median premium of the final price paid in the selected transactions relative to the target's last undisturbed closing stock price prior to public announcement of the initial bid of the acquirer. This analysis indicated a high, median and low premium, rounded to the nearest tenth, of 102.6%, 59.5% and 41.1%, respectively, across the period. Using this analysis, Goldman Sachs applied a reference range of illustrative premiums of 41.1% to 102.6% to the undisturbed closing price per Myovant common share of $17.96 as of September 30, 2022, and calculated a range of implied equity values per Myovant common share of $25.34 to $36.39.

38. The Proxy thereafter displays a table listing three precedent transactions analyzed by Goldman Sachs that met the criteria described above. The Proxy fails to identify, however, the enterprise value for each of the identified transactions. The Proxy also fails to disclose whether any of the identified transactions involved any competing bidders that might have boosted the premia. Further, the "Announcement Date" column should specify the exact date of the relevant announcement so that Myovant stockholders can determine the "last undisturbed closing stock price" that Goldman Sachs used to calculate the premia for each transaction and conduct their own historical price analysis with respect to each of the precedent transactions and confirm that such transactions are indeed analogous.[1] Finally, the Proxy should disclose whether the "selected" transactions identified represent the *only* transactions during the specified timeframe that met Goldman Sachs' criteria, or whether other transactions during the specified timeframe met Goldman Sachs' criteria, and if so, how many such transactions there were that were excluded from the Premia Analyses.

39. With respect to Goldman Sachs' Premia Analyses, the Proxy further describes a second analysis:

> ***Goldman Sachs also reviewed and analyzed, using publicly available information, the acquisition premia in acquisition transactions announced during the time period from January 1, 2012 through October 21, 2022, involving a public company as the target in a minority squeeze out transaction where the disclosed enterprise value for the transaction was over $1 billion***. For the entire period, using publicly available information, Goldman Sachs calculated the median premium of the final price paid in the selected transactions relative to the target's last undisturbed closing stock price prior to public announcement of the initial bid of the acquirer. This analysis indicated a high, median and low premium, rounded to the nearest tenth, of 45.3%, 37.4% and 15.2%, respectively, across the period. Using this analysis, Goldman Sachs applied a reference range of illustrative

---

[1] With respect to the Eidos Therapeutics, Inc./BridgeBio Pharma, Inc. transaction, Goldman Sachs should provide the actual "undisturbed closing stock price" used in Goldman Sachs' calculation since a footnote explains that the final offer premia for this transaction "was based on the undisturbed stock price prior to the final offer due to the length of the negotiation process."

premiums of 15% to 45% to the undisturbed closing price per Myovant common share of $17.96 as of September 30, 2022, and calculated a range of implied equity values per Myovant common share of $20.65 to $26.04.

40. The Proxy thereafter displays a table listing six analyzed precedent transactions analyzed by Goldman Sachs that met the criteria described above. The Proxy fails to identify, however, the enterprise value for each of the identified transactions. The Proxy also fails to disclose whether any of the identified transactions involved any competing bidders that might have boosted the premia. Further, the "Announcement Date" column should specify the exact date of the relevant announcement so that Myovant stockholders can determine the "last undisturbed closing stock price" that Goldman Sachs used to calculate the premia for each transaction and conduct their own historical price analysis with respect to each of the precedent transactions and confirm that such transactions are indeed analogous.[2] Finally, the Proxy should disclose whether the "selected" transactions identified represent the *only* transactions during the specified timeframe that met Goldman Sachs' criteria, or whether other transactions during the specified timeframe met Goldman Sachs' criteria, and if so, how many such transactions there were that were excluded from the Premia Analyses.

41. The information missing from the description of the Premia Analyses identified above is material to Myovant stockholders to help them understand the validity of the Premia Analyses, which served as one of three analyses forming the basis for the Fairness Opinion. While the missing information may be obtainable from other public sources, "[d]isclosures are not

---

[2] With respect to the Eidos Therapeutics, Inc./BridgeBio Pharma, Inc. transaction, Goldman Sachs should provide the actual "undisturbed closing stock price" used in Goldman Sachs' calculation since a footnote explains that the final offer premia for this transaction "was based on the undisturbed stock price prior to the final offer due to the length of the negotiation process."

11

supposed to send stockholders on a scavenger hunt." *Goldstein v. Denner*, 2022 WL 1671006, at *25 (Del. Ch. May 26, 2022). As such, the missing information must be disclosed in the Proxy.

42. Additionally, Goldman Sachs' Illustrative Discounted Cash Flow Analysis used a discount rate range of 12.0% to 14.0% (based on inputs not fully disclosed in the Proxy) to calculate the following range of illustrative present values for Myovant: $25.59 to $30.74 per share. Notably, however, a DCF analysis performed by online research firm Simply Wall Street calculated a discount rate of 7.5% for MYOV (based on fully disclosed inputs):

| Data Point | Calculation/ Source | Result |
|---|---|---|
| Risk-Free Rate | 5-Year Average of US Long-Term Govt Bond Rate | 2.0% |
| Equity Risk Premium | S&P Global | 6.4% |
| Biotechs Unlevered Beta | Simply Wall St/ S&P Global | 0.73 |
| Re-levered Beta | = 0.33 + [(0.66 * Unlevered beta) * (1 + (1 - tax rate) (Debt/Market Equity))]<br>= 0.33 + [(0.66 * 0.725) * (1 + (1 - 19.0%) (14.12%))] | 0.871 |
| Levered Beta | Levered Beta limited to 0.8 to 2.0<br>(practical range for a stable firm) | 0.871 |
| Discount Rate/ Cost of Equity | = Cost of Equity = Risk Free Rate + (Levered Beta * Equity Risk Premium)<br>= 1.98% + (0.871 * 6.35%) | 7.51% |

Calculation of Discount Rate/ Cost of Equity for NYSE:MYOV

43. The higher discount rate of 12.0% to 14.0% used by Goldman Sachs—based on inputs that are not fully disclosed in the Proxy and almost double that calculated by Simply Wall Street based on fully disclosed inputs—depressed the value range for Myovant's shares. *See In re Topps Co. S'holders Litig.*, 926 A.2d 58, 76 (Del. Ch. 2007) (raising discount rates drives down the resulting value range). Myovant stockholders are entitled to further disclosure on how

Goldman Sachs derived its excessively high discount rate range to fully evaluate the validity of the Illustrative Discounted Cash Flow Analysis. *See Topps*, 926 A.2d at 76 (subjective judgments regarding discount rates are not scientific, "but highly-paid valuation advisors should be able to rationally explain them.").

## CLAIMS FOR RELIEF

### COUNT I

**Against All Defendants
for Violations of Section 14(a) of the Exchange Act and Rule 14a-9**

44. Plaintiff incorporates and repeats each and every allegation above as if fully set forth herein.

45. SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any Proxy, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

46. Defendants disseminated the false and misleading Proxy, which made false and misleading statements, and failed to disclose material facts necessary in order to make statements made therein, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

47. By virtue of their positions within the Company, and/or roles in the process of preparing, reviewing, and/or disseminating the Proxy, Defendants were aware of their duty not to make false and misleading statements in the Proxy, and not to omit material facts from the Proxy

necessary to make statements made therein—in light of the circumstances under which they were made—not misleading.

48. Yet, as specified above, in violation of Section 14(a) of the Exchange Act and Rule 14a-9, Defendants (i) made untrue statements of material fact in the Proxy, and/or (ii) omitted material facts from the Proxy necessary to make statements therein— in light of the circumstances under which they were made—not misleading, in order to induce Myovant stockholders to vote in favor of the Merger. Defendants were at least negligent in filing the Proxy with these material misrepresentations and omissions.

49. The material misrepresentations and omissions in the Proxy specified above are material insofar as there is a substantial likelihood that a reasonable Myovant stockholder would consider them important in deciding whether to vote in favor of the Merger and related proposals. In addition, a reasonable Myovant stockholder would view disclosures of the omitted facts specified above as significantly altering the "total mix" of information made available to Myovant stockholders.

50. Because of the material misrepresentations and omissions in the Proxy specified above, Plaintiff and other Myovant stockholders are threatened with irreparable harm insofar as Plaintiff and other Myovant stockholders will be deprived of their entitlement to cast fully informed votes with respect to the Merger if such material misrepresentations and omissions are not corrected before the Stockholder Vote. Therefore, injunctive relief is appropriate.

## COUNT II

### Against the Individual Defendants for
### Violations of Section 20(a) of the Exchange Act

51. Plaintiff incorporates and repeats each and every allegation above as if fully set forth herein

52. The Individual Defendants acted as controlling persons of Myovant within the meaning of Section 20(a) of the Exchange Act, as alleged herein. By virtue of their positions as officers and/or directors of Myovant, and participation in, and/or awareness of Myovant's operations, and/or intimate knowledge of the contents of the Proxy filed with the SEC, they had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Myovant with respect to the Proxy, including the content and dissemination of the various statements in the Proxy that Plaintiff contends are materially false and misleading, and the omissions of material fact specified above.

53. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

54. Each of the Individual Defendants had direct and supervisory involvement in the negotiation of the Merger, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised same. In particular, the Proxy at issue references the unanimous recommendation of the Special Committee (and thereafter the Board, based on the Special Committee's recommendation) to approve the Merger, and recommend that Myovant stockholders vote for the Merger. The Individual Defendants were thus directly involved in the making of the Proxy.

55. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered in connection with such negotiation, review and approval.

56. By virtue of the foregoing, the Individual Defendants had the ability to exercise control over and did control a person or persons who violated Section 14(a), by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

57. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict upon Plaintiff and other Myovant stockholders in terms of casting fully informed votes with respect to the Merger.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A. Preliminarily and permanently enjoining Defendants and their counsel, employees and all other agents and persons acting in concert with them from proceeding with and holding the Stockholder Vote and consummating the Merger, unless and until Defendants disclose and disseminate to Myovant stockholders the material information specified above that has been omitted from the Proxy, and correct any false and misleading statements in the Proxy;

B. Rescinding, to the extent already implemented, the Merger Agreement or any of the transactions contemplated thereby, or granting Plaintiff rescissory damages;

C. Directing Defendants to account to Plaintiff for all damages suffered as a result of their misconduct;

D. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees and expenses; and

E. Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: December 11, 2022                    **WOHL & FRUCHTER LLP**

                                                     By:/s *Joshua E. Fruchter*
                                                     Joshua E. Fruchter (JF2970)
                                                     25 Robert Pitt Drive, Suite 209G
                                                     Monsey, NY 10952
                                                     Tel: (845) 290-6818
                                                     Fax: (718) 504-3773
                                                     Email: jfruchter@wohlfruchter.com

                                                     *Attorneys for Plaintiff*